# EXHIBIT 1

**HANTMAN & ASSOCIATES**
ATTORNEYS AT LAW
1120 Avenue of the Americas
4th Floor
New York, New York 10036
(P) 212-684-3933
(F) 212-465-2192
www.Hantmanlaw.com

**ROBERT J. HANTMAN**
rhantman@hantmanlaw.com
New York, New Jersey, & Florida Bars

August 1, 2025

**BY EMAIL**
The Honorable Gerald A. McHugh
United States District Judge
United States District Court, Eastern District of Pennsylvania
James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

Re: *Alisha Price v. Kohn, Swift & Graf, P.C., et al*. No. 2:24-cv-05684

Dear Judge McHugh,

  We represent Plaintiff Alisha Price in the original case filed in New York (*Price v. Kohn, Swift & Graf, P.C. et al*, 2:24-cv-04720, E.D.N.Y.) for Plaintiff Alisha Price—before it was transferred to this Court—and submit this letter in response to the Court's July 21, 2025, Order to Show Cause regarding potential dismissal for failure to prosecute. Out of urgency, and because we have not yet been admitted pro hac vice, we respectfully submit this letter via email to affirm Plaintiff's continuing intent to prosecute this action and to respectfully request a two-week extension, through and including August 15, 2025, to provide a more complete response and finalize local representation, among other requirements.

  Until recently, Plaintiff was preparing to be a defense witness in a criminal proceeding in the Eastern District of New York (*United States v. Cherwitz et al.*, No. 23-CR-146 (E.D.N.Y.), hereinafter the "Criminal Case")), which temporarily diverted much of her attention and resources. The impact of this on Plaintiff is expounded upon in the following pages. Nevertheless, she remains committed to prosecuting this case.

  Plaintiff has now retained local counsel in Pennsylvania, Mr. Clifford B. Cohn, copied in the underlying email herein, to assist with the prosecution of this matter and to facilitate pro hac vice admission of undersigned counsel. In the meantime, we are preparing the application for pro hac vice admission and will file promptly. In any event, efforts to resolve this case were rejected by Defendants, so it is clear that court intervention is the only remaining alternative.

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

At our client's urging, we are submitting a detailed account[1] of the background of this case and the factors that have contributed to any delay, while also providing the Court and Defendants with information to consider in the hope of reaching a resolution—or at least narrowing the issues—which can only be effectuated if the instant case is permitted to proceed.

We apologize for any inconvenience to the Court.

I. BACKGROUND

From 2006 to 2013, Plaintiff participated as an employee of OneTaste, a member of the spiritual community that formed around the company, and a resident in the urban monasteries established by OneTaste to advance the study of Orgasmic Meditation and its related philosophies. These teachings drew on ancient Tibetan Buddhist and Hindu traditions, as reflected in the organization's name—OneTaste—which is derived from an advanced Buddhist precept.

Plaintiff was approached by the FBI in April 2021 and was manipulated and bullied into speaking with agents before she had the opportunity to obtain legal counsel. Shortly thereafter, Plaintiff engaged Defendants as her legal counsel, specifically to assist her in responding to a grand jury subpoena in the simplest manner possible so as to minimize disruption to her life.

From the moment of their engagement until September 2022, Defendants sought to exploit Plaintiff by conspiring with the FBI to manipulate her into agreeing that she was a crime victim of the company OneTaste and its former principals, Nicole Daedone and Rachel Cherwitz, because Defendants sought to financially benefit from any resulting indictment by filing a civil suit.

Plaintiff belabored efforts to terminate Defendants' representation in September 2021, but rather than responding appropriately, Defendants disregarded Plaintiff's instructions for nearly a year. In September 2022, they renewed their efforts to pressure Plaintiff into cooperating with the FBI, thereby advancing their own self-serving interests.

On September 13, 2022, Plaintiff terminated Defendants for a second time, to which they again did not respond. On June 6, 2023, an indictment was unsealed charging Ms. Cherwitz and Ms. Daedone with conspiracy to commit forced labor. On July 8, 2024, Plaintiff filed this action against Defendants in the Eastern District of New York. On September 6, 2024, Defendants sought to have the case transferred to this Court, and it was removed on October 18, 2024. From May 5 to June 9, 2024, Ms. Daedone and Ms. Cherwitz stood trial for conspiracy to commit forced labor.

---

[1] Recognizing that this submission is not evidence, but rather a factual overview believed to be accurate by Plaintiff.

2

On June 10, 2024, they were convicted, and the following day, they were remanded into custody pending sentencing in September 2025. On July 21, 2025, this Court ordered that Plaintiff articulate good cause for her failure to prosecute this case.

## II.   IMPACT OF CRIMINAL CASE ON PLAINTIFF

As set out in Plaintiff's complaint filed on July 8, 2024, Plaintiff's claims for legal malpractice, fraud, intentional and negligent infliction of emotional distress, and other causes of action arise from the fact that, rather than protecting their client's rights, her attorney Neil Glazer and the law firm Kohn, Swift & Graf, P.C. collaborated with and aided law enforcement in their efforts to prosecute a business that was virtually guaranteed to attract publicity due to its focus on teaching practices such as Orgasmic Meditation ("OM") and operating monastic-style residences to explore that practice and philosophy.

The Criminal Case not only caused significant emotional harm to Plaintiff, but also revealed that the tactics employed by the FBI and Defendants were not isolated anomalies, but part of a broader scheme and pattern used to secure a conviction and facilitate Defendants' financial enrichment.

Plaintiff was included on the defense's witness list and experienced severe emotional distress from participating in a criminal trial involving her friends and colleagues, as well as from witnessing the role her former law firm played in grooming government witnesses for its own benefit. Since then, she and her counsel have been reviewing the trial transcripts to understand the full extent to which witness after witness was subjected to the same coercive pressures that Plaintiff herself experienced at the hands of federal agents, including threats of arrest and attempts to reframe their experiences as victimization, culminating in false and misleading testimony.

In addition to the stress caused by the trial, Plaintiff also endured immense pressure at the hands of Defendants, who ignored her instructions and sought to use her to advance their own financial interests. She further suffered the loss of her job, deterioration in her mental health, and was simultaneously managing the declining health of her aging parents. Despite these challenges, Plaintiff remains committed to pursuing this action and obtaining a just result.

### A. Pattern of Government Manipulation

As articulated in her September 2024 affidavit, the FBI appeared at Plaintiff's home unannounced and manipulated her into speaking with them outside the presence of counsel. When Plaintiff attempted to resist these pressures—clearly stating that she was not a victim—she was explicitly threatened with arrest, detention, and transportation to New York if she did not cooperate. Plaintiff was not the only witness subjected to such treatment.

3

After the indictment was unsealed, other witnesses were contacted by FBI Special Agent McGinnis and offered "victim assistance." One witness came forward and informed defense counsel that, when she reiterated she was not a victim—consistent with what she had originally told Special Agent McGinnis when he contacted her years earlier—she was met with renewed pressure.

Indeed, Plaintiff's worst fears—that if she did not cooperate with the FBI, as Defendants were pressuring her to do, she would become the target of a criminal investigation—were realized in the case of Ms. Cherwitz. In the Criminal Case, federal prosecutors attempted to persuade Ms. Cherwitz's attorneys that she was a victim of Ms. Daedone.

When Ms. Cherwitz resisted this characterization, she was, in an illogical about-face, named as the sole co-defendant and alleged co-conspirator in the Criminal Case. Furthermore, "after Ms. Cherwitz declined to identify as a victim, a phalanx of FBI agents in full SWAT gear descended on her home with a helicopter and convoy of SUVs, despite her attorney's assurances that she would be available to answer any questions that they had." *See* Criminal Case, Dkt. No. 99 at 3–4. Plaintiff faced very real consequences if she did not capitulate to Defendants' tactics pressuring her to cooperate with the FBI.

### B. Financial Incentives to Witnesses

If the threat of criminal prosecution was the "stick" used by Defendants and the FBI against Plaintiff, she also witnessed the corresponding "carrot" that had been offered to her employed on a grand scale in the Criminal Case.

Defendants attempted to manipulate Plaintiff into cooperating with the FBI by charging her only half of the agreed-upon retainer and suggesting that, if she served as a witness in the Criminal Case and a conviction was secured, it could be very "lucrative" for her. To her horror, Plaintiff has since witnessed the same incentives used to manufacture other so-called "victims."

As trial approached, it appeared that the government was financially incentivizing witnesses to testify, creating an environment that encouraged false victimization narratives. FBI agents and so-called "victim specialists" directed witnesses to seek compensation from state agencies, implicitly linking financial benefits to their cooperation and testimony.

Witnesses were informed that, if they testified, they could receive monetary compensation even before a conviction. Many witnesses proactively sought payment for their participation. One witness received $30,000 before the trial had even begun (*See* Criminal Case Hr'g Tr. 31:19–21, Feb. 25, 2025), and another received compensation despite having no employment relationship and only a brief customer interaction with the defendants in 2013. *See* Dkt. No. 285 at 3.

4

Another witness stated, "I'm not trying to get money, but I'm curious—how do I go about this?" To that, an FBI "victim specialist" responded, "If you don't get it from [New York State Services], you'll get it in the back end in restitution." *See* Criminal Case Hr'g Tr. 42:9–15, Apr. 9, 2025.

These were the same "victim specialists" to whom Defendants connected Plaintiff—individuals who told her that the distress she was experiencing was the result of her time at OneTaste, rather than the FBI's unwelcome intrusion into her life, as she had expressly communicated to them.

It is manifest that the FBI improperly incentivized witnesses to adopt the role of "victim witnesses" by luring them with the prospect of financial compensation, so long as they, and likely their personal attorneys, embraced the FBI's narrative about their experiences at OneTaste, regardless of the underlying facts.

C.  Scheme to Unjustly Enrich Witnesses and Defendants

Indeed, it has become clear to Plaintiff after the conclusion of the Criminal Case, when she was no longer sequestered and was able to review the transcripts, that Defendants' plans to profit from former participants of OneTaste are still underway and, in fact, have advanced.

As she stated in Plaintiff's September 2024 affidavit, Defendant Glazer told Plaintiff that if OneTaste's former owner, Nicole Daedone, were found guilty in the Criminal Case, he and his firm could file a civil suit against OneTaste for damages, and that it could be very lucrative for Plaintiff personally. Plaintiff was aware, even before the trial, that Defendants had already filed a civil suit against Daedone, Cherwitz, and OneTaste.

However, after reviewing the trial transcript, Plaintiff discovered that one of the civil claimants, Michal Neria, also testified as a government witness. Neria, who stated that she holds a master's degree in education, made outlandish claims on the stand, including that the criminal defendants were witches. When asked whether she took any responsibility for her own choices at OneTaste, she responded, "I take no responsibility." *See* Criminal Case Tr. 2903:15, 2909.

The fact that Defendants have continued their scheme of exploitative litigation aimed at financial enrichment, rather than the pursuit of genuine justice, even without Plaintiff's participation, has been deeply distressing to her.

Defendants knew that if they could tip the scales in favor of the government securing a conviction in the Criminal Case, they would not have to prove damages in their civil case. That is why they collaborated with the FBI: they had a vested interest in turning witnesses into "victim" witnesses, enabling them to now pursue claims against the defendants in the Criminal Case and the company OneTaste.

D. Fraudulent and Tampered Evidence

In fact, the FBI did not stop pressuring and incentivizing witnesses to identify as victims. They went so far as to rely on, and conceal the fraudulent nature of, "evidence" that had been clearly manufactured for a Netflix film.

The story of a woman known to Plaintiff, Ayries Blanck, was featured in a Netflix film about OneTaste. Although Ms. Blanck did not appear in the film, her sister, Autymn Blanck, appeared and read aloud from documents she claimed were "journals" that Ayries had sent her after leaving OneTaste.

These "journals" were later produced in Rule 16 discovery in the Criminal Case, and the defendants argued that they were foundational to the indictment. *See* Criminal Case Dkt. No. 298. The government not only initially insisted that the "journals" were authentic and contemporaneous accounts of events at OneTaste, but also heavily relied on them and their purported author, Blanck, in its pre-trial motions. *See* Criminal Case Dkt. No. 169.

There was, however, clear evidence that Blanck extensively altered and embellished these "journal" entries between May 4 and May 19, 2022, nearly seven years after she claimed to have originally written them.

Notably, one of these key "journal" entries, dated January 15, 2015, underwent substantial changes. For example, a phrase about "cream of wheat with butter" was altered to "soup," and a reference to taking a "red eye" from New York to the West Coast was deleted, as such a flight on that date was patently impossible. *See* Criminal Case Dkt. No. 327-5 at 4–6.

Blanck admitted that she had written the typewritten "journals" in collaboration with Netflix producer Sarah Gibson. *See* Criminal Case Dkt. No. 295 at 1. She further admitted that she had physically hand-copied them into an old notebook to make them appear authentic. *See* Criminal Case Dkt. No. 327-6 at 6–8.

Astonishingly, the government continued to rely on these fabricated documents until it was forced by overwhelming evidence to concede their falsity just one month before trial. *See* Criminal Case Dkt. No. 327-6 at 2. The defendants in the Criminal Case also uncovered evidence that Special Agent McGinnis had edit access to the typewritten version of these "journals," that the fabricated physical version was in McGinnis's sole custody for five weeks before being entered into evidence, and that while the custody log stated the FBI received three paperbound journals, the handwritten version was in a leatherbound journal. These discrepancies raise serious questions about the FBI's role in the creation of both the typewritten and handwritten versions. *See* Criminal Case Dkt. No. 300 at 2.

In fact, this is the same FBI agent who appeared in the Netflix film, interviewing yet another witness-turned-"victim," Audrey Wright. *See* Criminal Case Dkt. No. 99. Wright has also initiated legal proceedings against her former employer, OneTaste, as well as fellow participants in OneTaste residences and programs.

### E. First Amendment and constitutional interests

Plaintiff's case implicates significant First Amendment interests and constitutional protections. The government and Defendants employed coercive tactics against Plaintiff and others who were engaged in protected speech and religious activity.

The Criminal Case brought by the government explicitly targeted Plaintiff's and others' spiritual beliefs, characterizing their religious teachings and practices as inherently coercive and immoral. Government prosecutors told the jury outright that aspects of these beliefs and teachings were "not okay," effectively criminalizing spiritual conduct protected by the First Amendment.

The ramification of this attitude toward Plaintiff's sincerely held spiritual beliefs and practices have caused her to endure immense emotional and professional harm, including the loss of her job and severe anxiety. These injuries stem directly from the government's hostile intrusion into her spiritual life, personal boundaries, and constitutionally protected activities.

Defendants' role in this was instrumental, as they ignored their client's explicit instructions and instead sought to use Plaintiff to advance their own agenda and enrich themselves. This constitutional aspect highlights the importance of allowing Plaintiff to fully pursue her claims without unnecessary procedural barriers or unfair time constraints.

## III. ACTIVE EFFORTS BY PLAINTIFF TO SEEK RESOLUTION

Despite significant obstacles, Plaintiff has made repeated efforts to resolve her claims and reach a meaningful resolution. Defendants, however, have scarcely responded and have not engaged in any substantive discussions. Plaintiff's continued attempts reflect her good-faith intent to move this case forward, while Defendants' refusal to participate further supports granting additional time to prosecute her claims.

## IV. PLAINTIFF'S CLAIMS REPRESENT LEGITIMATE, SIGNIFICANT GRIEVANCES

Plaintiff's allegations reflect genuine grievances that implicate her fundamental rights to justice and fair representation. She sought legal counsel to disengage from the government's fraudulent and abusive tactics, but Defendants instead perpetuated her victimization by disregarding her clear instructions and pursuing a civil litigation strategy aligned with their own financial interests rather than Plaintiff's welfare. She has been forced to sit on the sidelines and

7

watch Defendants continue their scheme to profit from manufactured convictions, thereby securing civil awards, in close coordination with the FBI, which has only deepened her distress.

V. CONCLUSION

Given these circumstances, we respectfully request a two-week extension of time, through and including August 15, 2025, to submit a proper response to the Court's Order to Show Cause and to allow sufficient time to file other necessary appearance-related documents, including a motion for pro hac vice admission.

We appreciate the Court's consideration and remain available should the Court require any additional information.

Respectfully submitted,
/s/ Robert J. Hantman
Robert J. Hantman, Esq.
*Attorney for Plaintiff Alisha Price*