# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ALISHA PRICE, | Case No. 1:24-cv-4720 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1. **LEGAL MALPRACTICE;** |
| KOHN, SWIFT & GRAF, P.C. and<br>NEIL L. GLAZER, | 2. **FRAUD;** |
| Defendants. | 3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;** |
|  | 4. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS** |
|  | 5. **VIOLATION OF JUDICIARY LAW § 487** |
|  | 6. **UNJUST ENRICHMENT** |
|  | 7. **BREACH OF FIDUCIARY DUTIES** |
|  | 8. **BREACH OF CONTRACT** |
|  | **DEMAND FOR JURY TRIAL.** |

## COMPLAINT

Plaintiff Alisha Price, by and through her attorneys, Hantman & Associates, for her

Complaint against Kohn, Swift & Graf, P.C. ("KSG") and attorney Neil L. Glazer ("Glazer")

(collectively the "Defendants" or "Attorney Defendants"), alleges as follows:

## INTRODUCTION

1.       This case for legal malpractice, fraud, intentional infliction of emotional distress, negligent infliction of emotional distress, violation of Judiciary Law § 487, unjust enrichment, breach of fiduciary duties, and breach of contract arises out of to the actions of a law firm and its principal who prioritized its own financial interests over the best interests of plaintiff, a client who retained  them to protect her rights and interests with respect to an investigation of the FBI into OneTaste Incorporated whose teaching practices included orgasmic meditation ("OM")[1] and educational classes on a range of topics informed by the philosophy of OM.[2]

2.        OneTaste was founded in 2004, through a predecessor company that traded as OneTaste from 2005.

3.       It had, at one time, at least 35,000 participants in OneTaste's in-person events, and at least 16,000 have taken classes and workshops in Los Angeles, San Francisco, New York, Boulder, Las Vegas, London, and several smaller outposts worldwide.

4.       However, as in any organization there were a few disgruntled employees of OneTaste including its former counsel, who were trying to get 'take down media' published about OneTaste for years.

5.       An opportunity presented itself when a former student's roommate was approached to write a story on OneTaste for Bloomberg in late 2017.

6.       Ironically, the journalist herself said the story was wrong and unfair and said her editors made her do it.

---

[1] OM is a 15-minute partnered meditation practice in which the genitals of one of the partners are stroked deliberately in order to expand each partners ability to experience connection, pleasure and sensation in the body. (

[2] See Nicole Prause, PhD and Greg Siegle, PhD, **#1: What Is OM? A Baseline EEG Study Of The Mechanisms Of OM- IRB approved, Physiological study with 260 participants**, (https://iomfoundation.org/research/1-what-is-om-a-baseline-eeg-study-of-the-mechanisms-of-om/ (Scientific study on OM).

7.      After the Bloomberg story, by November 2018 OneTaste was being investigated by the FBI.

8.      Additionally, there was a BBC 10 series podcast broadcast in 2018 that repeated a lot of the false allegations appearing in the Bloomberg hit piece.[3]

9.      Based on the foregoing articles, Netflix, Inc. ("Netflix") released the film Orgasm Inc: The Story of OneTaste (the "Film") in 2022, "A Netflix Documentary" that was improperly categorized in "True Crime" genre in spite of emphasizing at the end that interviews were limited.

10.      This resulted in a "Perfect Storm," for OneTaste based on the "Me Too'' Movement and the 'Nexium' case which clearly influenced the F.B.I investigation which eventually resulted in an Indictment

11.      As detailed hereafter and as will be revealed in the course of discovery, the defendant lawyer are believed to have had substantial conflicts of interest and sought to assist in the prosecution of OneTaste and other defendants for their own pecuniary benefit in the case of United States of America against Rachel Cherwitz and Nicole Daedone  Indictment filed April 3, 2023 in the United States District of New York, Eastern District of New York.

12.      Based on sworn declarations, corroborated by numerous documents and publicly available information, Plaintiff was preyed upon and used as a "pawn" by her own law firm.

13.      Rather than protecting her rights, the law firm collaborated with and aided law enforcement in their quest to prosecute a business guaranteed to garner publicity due to its focus on teaching practices such as orgasmic meditation ("OM") and slow sex.

---

[3] Co-Founder of OneTaste, Nicole Daedone Rachel Cherwiz and OneTaste sued the BBC for defamation in March 2022. That case is stayed pending the resolution of  a pending criminal case which gave rise to this lawsuit. .

14.     As detailed herein, and as discovery will reveal, the Attorney Defendants operated a crime-victims mill for personal profit. Instead of seeking the truth and protecting their clients' interests, they collaborated with the FBI at the taxpayers' expense.

15.     Plaintiff first attended OneTaste events in 2006 and found the focus on OM aligned with her desire to explore her sexuality and practiced OM regularly for 7 years and participated in many events both as a student and later as a facilitator, sharing her personal experience with OM and teaching it to others.

16.     Plaintiff found OM to be a perfect complement to meditation, yoga, dance and other activities which were a central part of her life as she was looking for one piece that was missing which related directly to her sexual energy and potency as a woman.

17.      When she began to OM and connected with OneTaste and the associated community of OM practitioners she dove into the practice with as much gusto and dedication as she had done with other practices in her life.

18.     In 2013 Plaintiff chose to leave her employment as a facilitator within OneTaste for personal reasons and not because she believed there as any wrongdoing.

19.     Plaintiff retained Defendants on or about April 8, 2021, after she had been subpoenaed to provide information on OneTaste.

20.     Rather than professionally advise and protect Plaintiff, the Defendants, jointly and severally, assisted the FBI in building its criminal case by manipulating, bullying, and harassing her.

21.     Their objective was to convince her to assume the role of a "crime victim," thereby enabling the government to pursue a criminal prosecution.

22.     The Defendants intended to leverage this prosecution to sue OneTaste and its owners for millions, from which they anticipated receiving a substantial contingency fee.

23.      When Plaintiff refused to assume that role, as it was not based on the true facts, the Attorney Defendants devastated their client's life.

24.     Plaintiff repeatedly insisted that she was not a victim of any crime at OneTaste and did not wish to be involved in an FBI investigation.

25.     She was busy living her own life, caring for her elderly parents in Florida,[4] and had no involvement in the matters under investigation.

26.     Plaintiff simply sought the Attorney Defendants' assistance in responding to a subpoena, a simple matter as all she wanted to address the matter promptly and minimize any disruption to her life.

27.      Instead, the Attorney Defendants viewed Plaintiff as a target rather than a witness, transforming her peaceful life into utter chaos for their own financial benefit.

28.      Rather than taking Plaintiff at her word, the Attorney Defendants, in violation of their legal and ethical duties, betrayed their own client and collaborated with the FBI against her.

29.     The Attorney Defendants insisted that Plaintiff had been victimized to such an extent that she was unaware of her own victimization.

30.     The Defendants went so far as to use the FBI victim services to groom Plaintiff as a "crime victim" for their own financial gain.

31.     Plaintiff went from being a third-party witness in need of simple and straightforward legal advice to being coerced into meeting with mental health professionals who

---

[4] Plaintiffs father tragically passing away this year with the Plaintiff yet in the throes of these legal matters.

specialized in treating victims of mass shootings, all at the insistence of her attorneys and their FBI co-conspirators.

32.     The Defendants' scheme was for Plaintiff to play the role of a "crime victim" against her wishes, resulting in severe emotional distress, financial harm, and detriment to her career and relationships, including those with her family and close friends.

33.     Unbeknownst to Plaintiff, this was consistent with the Attorney Defendants' business model as the Defendants used advertising to recruit "crime victims".

34.     The Defendants, rather than performing the legal services for which Plaintiff had hired them, sought to convince her that she was a "crime victim" once they realized her story did not align with the narrative they intended to exploit in a civil suit against OneTaste.

## THE PARTIES

35.     Plaintiff Alisha Price is, and at all relevant times was, a resident of the State of Florida.

36.     Defendant Kohn, Swift & Graf, P.C. ("KSG") is, and at all relevant times was, a law firm with its principal place of business in Philadelphia, Pennsylvania.

37.     Defendant Neil L. Glazer is, and at all relevant times was, an attorney at the law firm, KSG, and according to KSG's website, he  is admitted to practice law in the State of New York, including in the United States District Court for the Eastern District of New York.

## JURISDICTION AND VENUE

38.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 complete diversity of citizenship exists between Plaintiff and Defendants, and the matter in controversy exceeds the sum or value of $75,000.

39.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2).

40.     This Court has Personal Jurisdiction over the defendants in this action because they transact business within the state and contracts to supply legal services in the state,   and committed their tortious act against the Plaintiff within the state, and committed further tortious acts without the state causing injury to person or property within the state, and  i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

41.     Specifically, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district because defendants' scheme to convince Plaintiff into agreeing that she was a crime victim entitled to financial compensation from OneTaste occurred in connection with an FBI investigation out of this district, which resulted in an indictment filed in this district

42.     The law services that Plaintiff retained the Attorney Defendants to provide concerned the Attorney Defendants' representation of Plaintiff in connection with a legal matter pending in this district.

## GENERAL ALLEGATIONS

43.     In April 2021, FBI agents came to Ms. Price's mother's home in Florida and served Plaintiff with a subpoena issued in connection with the FBI's investigation of OneTaste.

44.      Plaintiff was a former employee at OneTaste, and the FBI agents told Plaintiff that she had two options: she could either speak with them at that moment or would be required to report to a court in New York state in two weeks.

45.     Plaintiff told the agents that she did not consider herself a victim and they informed her they would be contacting her again to take statements.

46.     When she asked if she had a choice in this they said no and Plaintiff reasonably believed them, was very upset, scared, and worried that she would be charged with some crime if she did not cooperate Plaintiff was told that she would be arrested, detained, and transported to New York if she did not willingly appear for questioning.

47.     In April 2021, Ms. Price retained Defendants to represent her in connection with responding to the subpoena.

48.     Plaintiff informed Glazer that another attorney had quoted her $5,000 for a retainer, and Glazer immediately offered to take Plaintiff's case for a $2,500 "flat fee" retainer to represent Plaintiff in connection with her communications with the United States Attorney's Office and the FBI with regard to the OneTaste subpoena. (the "Retainer Fee").

49.     Plaintiff paid Defendants the $2,500 Retainer Fee and told Glazer during their initial conversation that she wanted nothing to do with the OneTaste investigation or the FBI.

50.     At the time, Plaintiff felt distressed by the FBI's threats to arrest her if she did not participate in their investigation of OneTaste, and Plaintiff communicated to Glazer that she was seeking his expertise to advocate for her interests, which she expressed was to end her involvement in the investigation as quickly as possible.

51.     In April 2021, Glazer then offered to contact and interact with the FBI on Plaintiff's behalf Glazer told Plaintiff that when the FBI wants to talk to you, you do not have a choice.

52. Glazer also instructed Plaintiff not to speak to anyone about the FBI contacting her, including her immediate family members, and further told Plaintiff that if she did speak to anyone, the FBI would then come and interview whoever she told.

53. Wanting to protect her loved ones from the FBI's harassment, Plaintiff did her best to not talk to any of her friends and family members and bore the psychological burden of the ongoing FBI investigation alone, but under that fear, at moments she found the pressure overwhelming and shared her emotional distress with others.

54. In April 2021, Glazer had a conversation with Plaintiff in which he tried to extract more information from Plaintiff about her being a victim of OneTaste.

55. When Glazer and his legal assistant interviewed the Plaintiff by phone she was scared and was trying to walk a line of cooperating with the FBI because she thought she had no choice and might get charged if she did not, she was also trying to cooperate with Glazer so that he would help her with my request to not participate in investigation or any possible trial in the future, yet she made it clear that she did not believe she was a victim of a crime.

56. Plaintiff made it clear to Glazer that nothing she experienced at OneTaste amounted to anything near a crime.

57. Plaintiff was anxious to have the matter resolved with the FBI, but Glazer was not able to provide any information in that regard.

58. In or around May 2021, Plaintiff left multiple messages, but Glazer never returned her calls or emails.

59. Plaintiff could not obtain any information from Glazer about the status of the matter that she had retained the Defendants to resolve.

60.     Meanwhile, the psychological toll of the unresolved FBI investigation weighed heavily on Plaintiff.

61.     Between May and September 2021, Plaintiff continued to feel immense anxiety and stress as a result of being told by the FBI that she had to participate in their investigation against her will  which interfered in her ability to focus and perform her duties at work became severely compromised.

62.     In September 2021, Plaintiff was terminated from her employment as a master stylist and colorist at a salon in Florida due to being so depressed and anxious about the FBI contacting her and Glazer's insistence that Plaintiff could not get out of cooperating with the government.

63.      After being fired she had an emotional breakdown and reached out to Glazer.

64.      Only after she told him that she had been fired from her job did Glazer return her call.

65.     When they spoke, Plaintiff told Glazer that if she had to participate in the investigation then he had to get her help to deal with the enormous repercussions it was having on her mental health and her livelihood.

66.     Glazer offered to put Plaintiff—who was not in therapy at the time—in touch with a victim witness specialist from the federal government, even though Plaintiff had previously stated that she did not believe she was a crime victim.

67.     Plaintiff asked Glazer if this person would report her conversation back to the FBI, as Plaintiff wanted to be certain that by speaking to a victim specialist she would not be unwittingly participating in the investigation.

68.     Glazer assured her that this would not happen.

69.     Plaintiff was connected to a victim specialist and to reach out to him  everal times before she was able to contact him.

70.     Speaking to him only further distressed the Plaintiff.

71.     When Plaintiff told him that the FBI's unwelcome intrusion into her life was causing her great distress, he told Plaintiff she was wrong and that the conduct she had experienced at OneTaste was the cause of her distress.

72.     He then put Plaintiff in contact with a female federal agent who in turn connected her with an organization that supported sex trafficking victims.

73.     In desperate need of help to deal with the anxiety of involuntarily being involved in the FBI investigation, Plaintiff contacted the organization.

74.     Upon speaking to the receptionist however, Plaintiff immediately knew this facility would be of no use to her because they were approaching her as if she was a victim of sex trafficking, which she knew herself not to be true.

75.     Plaintiff told the organization that she did not need their services as she was not the victim of a crime.

76.     In September 2021, Plaintiff told both the victim witness specialist and Glazer that she wanted to resolve the matter and did not want to be involved. Plaintiff continually said she is not a victim and did not want to be involved.

77.     Glazer refused to return Plaintiff's calls, and Plaintiff could not obtain any confirmation about the matter being resolved.

78.     A year later, in or about August 2022, Glazer contacted Plaintiff unexpectedly and informed Plaintiff that the FBI requested that Plaintiff travel to New York City to give sworn testimony about her OneTaste experience.

79.     Plaintiff replied that she did not want to be involved and that her instructions were for Glazer to ensure that she did not have to participate.

80.     Rather than address Plaintiff's concerns, Glazer proceeded to paint a detailed picture of what it would look like for Plaintiff to travel to New York to give testimony and potentially participate in a trial.

81.     Glazer insisted on telling Plaintiff how he was going to take care of her in New York and ensure she had whatever food she wanted while she was there.

82.     When Plaintiff expressed concern about not being able to pay Glazer to represent her should she have to participate in a trial, Glazer told the Plaintiff to not worry about the money.

83.     Glazer told Plaintiff that if OneTaste's former owner, Nicole Daedone, is found guilty as a result of the criminal investigation, Glazer and his firm could sue OneTaste civilly for damages and it could be very lucrative for Plaintiff.

84.     After this conversation, Glazer called Plaintiff back with proposals, to try to ensure that she continued to participate in the investigation against former OneTaste executives. Plaintiff was told that she would need to travel to New York City to give a deposition, Glazer had to explain what a deposition was as well as other terms such as investigation phase, discovery, inditement, to the Plaintiff as all of this was completely foreign to her. After the explanation the Plaintiff said she did not want to do the deposition

85.     Glazer told Plaintiff that he had talked to the FBI and that the FBI had acknowledged to him that agents ambushed Plaintiff at Plaintiff's mother's home with a subpoena was traumatizing and an overreach on the FBI's part.

86.     Plaintiff contacted another federal victim specialist with whom Glazer had connected Plaintiff, "Victim Specialist Two."  Victim Specialist Two confirmed to Plaintiff that the agent would not attend Plaintiff's interview. Victim Specialist Two confirmed this by text on August 29, 2022.

87.     On August 29, 2022, Plaintiff wrote to Victim Specialist Two, ***"I would prefer it if you emailed communications to me rather than texted them."***  To which Victim Specialist Two said, "***Ok we also need to be careful what we write in emails because of discovery***." This mirrored the same caution that Glazer had given Plaintiff.

88.     On August 30, 2022, Plaintiff wrote, "***all of this is taking me away from my real life.***"

89.     On a phone call around this time Plaintiff communicated to Victim Specialist Two that she did not consider herself a victim and mentioned that she had already been in this situation unwillingly for about a year and a half.

90.     Victim Specialist Two was silent for some time and then said to Plaintiff, "this is not right."  Plaintiff told her, "I agree.  this whole thing has been completely awful for me."

91.     Shortly after that conversation Plaintiff emailed Victim Specialist Two and Glazer describing how distressed she had been since the FBI contacted her, that offering her sex trafficking counselling was extremely manipulative and that they could not genuinely believe she was a victim and treat her as they had been.

92.     Not long after this email Plaintiff also spoke to Glazer and strongly told him that both he and the FBI needed to leave Plaintiff alone.

93.     On September 12, 2022, Victim Specialist Two texted the Plaintiff, ***"Hi Alicia I apologize for just responding but I was out of town.  Based on your last emails we were under***

*the impression that you did not want to speak to us; which we told your you[r] attorney we would respect.  I don't want to upset by this message but I didn't want you to think I was ignoring you.  We won't reach out to in the future to respect your boundaries but if you need assistance from me or decide you would like to talk don't hesitate to reach out."*

94.     Plaintiff responded to Victim Specialist Two's text messages to ask whether Victim Specialist Two was speaking for the FBI, the New York DA or just victim services. Victim Specialist Two said, "***The FBI and I spoke to [Glazer] and told him we won't push you***."

95.     Plaintiff responded to Victim Specialist Two by advising that Glazer did not contact Plaintiff with any updated information.

96.     Plaintiff said she believed that Glazer did more to help the FBI than to help Plaintiff and informed the specialist that not "pushing her" is not the same thing as not contacting her, as she had requested..

97.     She then asked Victim Specialist Two to confirm that there was a 0% chance the FBI would contact her again. with the following message, "***Neil did not contact me with any updated info.  He's a total disappointment to be honest … He did more to help the DA he did more work to help me***.  ***Wouldn't push me and will not contact me are not the same thing. What is the likelihood the FBI will contact me again?  Is it a 0% chance? The NYDA?"***

98.     Victim Specialist Two responded to Plaintiff by texting, "***no you will not be hearing from us. I have zero idea about the nyda as that is a separate office."***

99.     On September 13, 2022, Plaintiff emailed Glazer to terminate the representation. which Glazer did not respond to.

100.     In June 2023, Glazer emailed Plaintiff about the indictment of Nicole Daedone and Rachel Cherwitz.

101.     Glazer did not acknowledge Plaintiff's prior email terminating his engagement.

102.     Plaintiff came to believe that the reason the Attorney Defendants had refused to help her resolve the matter she had retained them to help her with was because they did not want to jeopardize an indictment not being filed, because they sought to financially benefit from the indictment by filing a civil suit.

103.     Shortly thereafter, Plaintiff saw an advertisement from KSG soliciting plaintiffs for a potential civil action related to the FBI's investigation of OneTaste, Nicole Daedone and Rachel Cherwitz, which confirmed Plaintiff's belief  while the defendants filed their Civil Case o 1:24-cv-04434 on June 6, 21/24

104.     In June 2024, counsel for Plaintiff repeatedly requested that the Attorney Defendants produce Plaintiff's entire case file, but in violation of their legal and ethical duties, the Attorney Defendants did not respond and, to date, have failed to produce their former client's case file.

## CLAIMS FOR RELIEF

### COUNT ONE

#### (Legal Malpractice - Negligence Against All Defendants)

105.     Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs, as though fully set forth herein.

106.     The Attorney Defendants failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession.

107. Plaintiff would have had a better result in the underlying matter for which she had retained the Attorney Defendants but for the Attorney Defendants' negligence and Plaintiff would not have suffered the damages Plaintiff suffered but for the Attorney Defendants' negligence.

108. Plaintiff suffered actual and ascertainable damages in the form of loss of employment and litigation expenses incurred in an attempt to minimize or reduce the damage caused by the Attorney Defendants' wrongful conduct, and punitive damages on the ground that the Attorney Defendants' conduct, in violating their legal and ethical duties to their client, in favor of their joint venture with the FBI, was so outrageous as to evidence a high degree of moral turpitude and wanton dishonesty that imply a criminal indifference to civil obligations.

## COUNT TWO

### (Fraud Against All Defendants)

109. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

110. The Attorney Defendants made material misrepresentations and omissions of fact in that they failed to disclose to Plaintiff that their true intention was to use their representation of Plaintiff to groom her as a "crime victim" in support of a criminal indictment that would ultimately serve as the basis for civil litigation against OneTaste for the financial benefit of the Attorney Defendants.

111. The Attorney Defendants knew that they were making material misrepresentations and omissions of fact because the Attorney Defendants were aware of the scheme at the time that it was being perpetrated, as it is the Attorney Defendants' business model and the Attorney Defendants have used advertising to solicit crime victims.

112.     Plaintiff reasonably relied on the material misrepresentations and omissions of the Attorney Defendants to her own detriment.

113.      It was reasonable for Plaintiff to believe that attorneys would comply with their legal and ethical obligations to their clients and not be working to help the FBI's prosecution of OneTaste for the purpose of manufacturing a civil suit against OneTaste.

114.     Plaintiff suffered actual and ascertainable damages in the form of loss of employment and litigation expenses incurred in an attempt to minimize or reduce the damage caused by the Attorney Defendants' wrongful conduct, and punitive damages on the ground that the Attorney Defendants' conduct, in violating their legal and ethical duties to their client, in favor of their joint venture with the FBI, was so outrageous as to evidence a high degree of moral turpitude and wanton dishonesty that imply a criminal indifference to civil obligations.

## COUNT THREE

### (Intentional Infliction of Emotional Distress Against All Defendants)

115.     Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs, as though fully set forth herein.

116.     The Attorney Defendants conduct is shocking and repugnant conduct that should not be tolerated in a civilized society by members of any respectable profession, let alone, by attorneys who have legal and ethical duties to their clients.

117.     The Attorney Defendants' conduct caused Plaintiff to suffer debilitating emotional distress and harm.

118.     Plaintiff suffered actual and ascertainable damages in the form of loss of employment and litigation expenses incurred in an attempt to minimize or reduce the damage caused by the Attorney Defendants' wrongful conduct, and punitive damages on the ground that

the Attorney Defendants' conduct, in violating of their legal and ethical duties to their client, in favor of their joint venture with the FBI, was so outrageous as to evidence a high degree of moral turpitude and wanton dishonesty that imply a criminal indifference to civil obligations.

## COUNT FOUR

### (Negligent Infliction of Emotional Distress Against All Defendants)

119.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs, as though fully set forth herein.

120.    The Attorney Defendants breached a duty of care to Plaintiff.

121.    The Attorney Defendants conduct is shocking and repugnant conduct that should not be tolerated in a civilized society by members of any respectable profession, let alone, by attorneys who have legal and ethical duties to their clients.

122.    The Attorney Defendants' conduct caused Plaintiff to suffer debilitating emotional distress and harm

123.    Plaintiff suffered actual and ascertainable damages in the form of loss of employment and litigation expenses incurred in an attempt to minimize or reduce the damage caused by the Attorney Defendants' wrongful conduct, and punitive damages on the ground that the Attorney Defendants' conduct, in violating of their legal and ethical duties to their client, in favor of their joint venture with the FBI, was so outrageous as to evidence a high degree of moral turpitude and wanton dishonesty that imply a criminal indifference to civil obligations.

## COUNT FIVE

### (Violation of Judiciary Law § 487)[5]

---

[5] New York Judiciary Law § 487 is a punitive statute that allows an injured party to recover treble damages from an attorney who has engaged in willful misconduct.

124.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs, as though fully set forth herein.

125.    The Attorney Defendants above-described actions display a clear intent to deceive the Plaintiff.

126.    The Attorney Defendants above-described actions and omissions were intentionally intended to and did delay Plaintiffs' matter further implicating her with the FBI and against her express wishes to get herself out of the entire situation as quickly as possible.

127.    Plaintiff suffered actual and ascertainable damages in the form of loss of employment and litigation expenses incurred in an attempt to minimize or reduce the damage caused by the Attorney Defendants' wrongful conduct, and punitive damages on the ground that the Attorney Defendants' conduct, in violating of their legal and ethical duties to their client, in favor of their joint venture with the FBI, was so outrageous as to evidence a high degree of moral turpitude and wanton dishonesty that imply a criminal indifference to civil obligations.

## COUNT SIX

### (Unjust Enrichment)

128.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs, as though fully set forth herein.

---

New York Judiciary Law § 487 provides that an attorney who [i] is guilty of any deceit or collusion, or consents to any deceit or collusion, with the intent to deceive the court or any party; or [ii] willfully delays his client's suit with a view to his own gain; or willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for, is guilty of a misdemeanor and is liable for treble damages to the aggrieved party. The Court of Appeals further stipulates that the "deceit or collusion" referenced in the statute need not be successful to fall under Judiciary Law § 487 (1), and the recovery of treble damages does not depend upon the court's belief in a material misrepresentation of fact in a complaint – [the] mere existence of such misrepresentation is sufficient, as the lawsuit could not have gone forward without said material misrepresentation. Amalfitano v. Rosenberg, 12 N.Y.3d 8 (2009).

129.     Defendants were paid the Retainer Fee to assist Plaintiff yet utterly disregarded her goals in representing her.

130.     Defendants were enriched even further as they capitalized on their dishonesty and manipulation of the Plaintiff to sue OneTaste civilly for damages which they have and will obtain legal fees from.

131.     Plaintiff suffered actual and ascertainable damages in the form of loss of employment and litigation expenses incurred in an attempt to minimize or reduce the damage caused by the Attorney Defendants' wrongful conduct, and punitive damages on the ground that the Attorney Defendants' conduct, in violating of their legal and ethical duties to their client, in favor of their joint venture with the FBI, was so outrageous as to evidence a high degree of moral turpitude and wanton dishonesty that imply a criminal indifference to civil obligations.

## COUNT SEVEN

### (Breach of Fiduciary Duty)

132.      Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs, as though fully set forth herein.

133.     The Attorney Defendants and the Plaintiff had a relationship in which fiduciary responsibility on the part of Attorney Defendants arose.

134.     The Attorney Defendants created their own conflict of interest and capitalized on the same.

135.     The Attorney Defendants aforementioned misconduct despite this duty caused Plaintiff damages.

136.     Plaintiff suffered actual and ascertainable damages in the form of loss of employment and litigation expenses incurred in an attempt to minimize or reduce the damage

caused by the Attorney Defendants' wrongful conduct, and punitive damages on the ground that the Attorney Defendants' conduct, in violating of their legal and ethical duties to their client, in favor of their joint venture with the FBI, was so outrageous as to evidence a high degree of moral turpitude and wanton dishonesty that imply a criminal indifference to civil obligations.

## COUNT EIGHT

### (Breach of Contract)

137.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs, as though fully set forth herein.

138.    The Attorney Defendants and the Plaintiff entered into an agreement for legal services on or about April 8, 2021. (the "Retainer Agreement")

139.    The Retainer Agreement required Plaintiff to pay $2,500 for  Attorney Defendants' services.

140.    The Plaintiff fully performed under the Retainer Agreement by tendering the Retainer Fee and otherwise cooperating with the Attorney Defendants,  eventually to her detriment.

141.    The Attorney Defendants breached the Retainer Agreement by failing to act and acting to Plaintiff's detriment.

142.    Plaintiff suffered actual and ascertainable damages in the form of loss of employment and litigation expenses incurred in an attempt to minimize or reduce the damage caused by the Attorney Defendants' wrongful conduct, and punitive damages on the ground that the Attorney Defendants' conduct, in violating of their legal and ethical duties to their client, in favor of their joint venture with the FBI, was so outrageous as to evidence a high degree of moral turpitude and wanton dishonesty that imply a criminal indifference to civil obligations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against defendants, and each of them, as follows:

1.      For compensatory damages, and other special, general, and consequential damages in an amount in excess of the statutory limit;

2.      For punitive and exemplary damages;

3.      For an award of interest, including prejudgment interest, according to law;

4.      For an award of costs of suit;

5.      For such other further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

DATED: July 7, 2024

/s/ Robert J. Hantman
Robert J. Hantman, Esq.
rhantman@hantmanlaw.com
Joseph Ferrara  Esq.
Nyall J. Cook, Esq
**Hantman & Associates**
1120 Avenue of the Americas, 4th Floor
New York, New York 10036
(212) 684-3933
https://www.hantmanlaw.com/
*Attorneys for Plaintiff Alisha Price*